_____ Priority
✓ Send
_____ Clsd
_____ Enter
_____ JS-5/JS-6
_____ JS-2/JS-3

FILED
CLERK, U.S. DISTRICT COURT

MAY 5 2006

CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

DANIEL SEPULVEDA, ANITA
PEREZ, and ANTONIO
PRANGNER, individually and on
behalf of all similarly situated
individuals,

               Plaintiffs,

      v.

WAL-MART STORES, INC., a
Delaware corporation, and Does 1
through 100, inclusive,

               Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 04-1003 DSF (Ex)

ORDER DENYING PLAINTIFFS'
MOTION FOR CLASS
CERTIFICATION; GRANTING IN
PART AND DENYING IN PART
DEFENDANT'S MOTION TO
EXCLUDE DECLARATIONS OF
UNDISCLOSED WITNESSES;
DENYING DEFENDANT'S
MOTION TO EXCLUDE
DECLARATION AND REPORT OF
DAVID I. LEVINE; AND DENYING
PLAINTIFFS' MOTION TO
EXCLUDE DECLARATION OF
ALI SAAD, PhD.

DOCKETED ON CM

MAY - 8 2006

BY _____ 12 _____ 007

## I. INTRODUCTION

Plaintiffs' Notice of Motion for Class Certification and Plaintiffs'

Memorandum of Points and Authorities in Support of Motion for Class

Certification ("Motion") were filed on February 15, 2006.[1]  In brief, Plaintiffs

allege that since January 14, 2000, Defendant Wal-Mart Stores, Inc. ("Wal-Mart")

has erroneously classified its assistant managers in California as exempt from

California requirements regarding overtime pay and meal and rest breaks.

---

[1] On February 22, 2006, Plaintiffs submitted a Notice of Errata correcting certain errors
in the original Motion.

ORIGINAL

1   Plaintiffs contend that despite their job titles, the assistant managers actually

2   performed many of the same duties as Defendant's non-exempt employees, and

3   therefore should be classified as non-exempt. Plaintiffs allege that Defendant has

4   violated several provisions of the California Labor Code governing overtime pay,

5   meal breaks, reporting of hours, and prompt payment of wages; Plaintiffs also

6   allege that Defendant engaged in unfair competition in violation of California

7   Business and Professions Code § 17200 *et seq.*, and converted Plaintiffs' funds.

8   Plaintiffs now ask the Court to certify a plaintiff class consisting of all assistant

9   managers employed by Defendant in California from January 14, 2000 to the

10  present (the "class period").

11          Plaintiffs submitted the following documents in support of the Motion on

12  February 15, 2006: an Appendix of Foreign Authorities; the Declaration of David

13  Levine, Ph.D. ("Levine Declaration") and the Expert Report of David Levine,

14  Ph.D. filed as Exhibit A thereto ("Levine Report"); the Declaration of Robert J.

15  Drexler, Jr. and exhibits thereto ("Drexler Declaration"); the Declaration of Daniel

16  A. Crawford and exhibits thereto[2] ("Crawford Declaration"); the Declaration of

17  Daniel Sepulveda ("Sepulveda Declaration"); the Declaration of Antonio Prangner

18  ("Prangner Declaration"); the Declaration of John N. Quisenberry Regarding

19  Adequacy of Class Counsel ("Quisenberry Declaration"); and the Declaration of

20  Steven G. Pearl Regarding Adequacy of Class Counsel ("Pearl Declaration").

21          Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for

22  Class Certification ("Opposition") was filed on March 15, 2006. Defendant

23  concurrently filed an Appendix of Unpublished Cases; the Declaration of Michael

24

25  _____

26  [2] Attached as Exhibit A to the Crawford Declaration are 120 declarations of putative
    class members. These declarations will be referred to by the declarant's last name,

27  followed by the designation "AM Declaration." The same convention will be used for
    the nine declarations attached as Exhibit A to the Declaration of Robert J. Drexler filed

28  in support of Plaintiffs' Reply.

2

1  J. Gray and exhibits thereto ("Gray Declaration"); and the Declaration of Ali Saad,

2  Ph.D. and exhibits thereto ("Saad Declaration").[3]  Defendant also relies on a

3  second Declaration of Ali Saad, Ph.D. ("Supplemental Saad Declaration") filed on

4  April 10, 2006.

5      Plaintiffs' Reply Re: Motion for Class Certification ("Reply") was filed on

6  April 7, 2006.  Plaintiffs concurrently filed a second Declaration of Robert J.

7  Drexler and exhibits thereto ("Supplemental Drexler Declaration") and a second

8  Declaration of David I. Levine Ph.D. and exhibits thereto ("Supplemental Levine

9  Declaration").

10     Having considered the papers submitted by the parties and having heard the

11 oral argument of counsel, the Court DENIES the Motion.

12

13                    **II.  LEGAL STANDARD**

14     Before certifying a class, the trial court must conduct a "rigorous analysis"

15 to determine whether the party seeking certification has met the prerequisites of

16 Rule 23 of the Federal Rules of Civil Procedure.  <u>Valentino v. Carter-Wallace,</u>

17 <u>Inc.</u>, 97 F.3d 1227, 1233 (9th Cir. 1996).  The party seeking certification must

18 satisfy all requirements of Rule 23(a), <u>id.</u> at 1234, which are:

19         (1) the class is so numerous that joinder of all members is

20         impracticable, (2) there are questions of law or fact common to the

21         class, (3) the claims or defenses of the representatives are typical of

22         the claims or defenses of the class, and (4) the representative parties

23         will fairly and adequately protect the interests of all members of the

24         class.

25

26 ─────────────────

27 [3]  The Gray and Saad Declarations were originally filed on March 15, 2006.  On March
   30, 2006, Defendant filed a Notice of Errata along with corrected versions of the
28 declarations.

                                    3

1    Next plaintiffs must show that they satisfy one of the three provisions of

2  Rule 23(b).  Valentino, 97 F.3d at 1233.  A class may be certified under Rule

3  23(b)(1) if the prosecution of separate actions would create a risk of inconsistent

4  judgments.  Rule 23(b)(2) certifications are appropriate where the party opposing

5  the class has acted or refused to act on grounds generally applicable to the class,

6  justifying injunctive or declaratory relief.  A class may be certified under Rule

7  23(b)(3) where questions of law or fact common to members of the class

8  predominate and a class action is superior to other available methods.

9    Rule 23 (c)(1) directs the court to determine "at an early practicable time"[4]

10  whether to certify an action as a class action.  At this stage of the proceedings, the

11  Court must accept the factual allegations in the complaint as true.  Blackie v.

12  Barrack, 524 F.2d 891, 901 n.17 (9th Cir. 1975).  However, because "the class

13  determination generally involves considerations that are enmeshed in the factual

14  and legal issues comprising the plaintiff's cause of action," a court must often look

15  behind the pleadings "to evaluate carefully the legitimacy of the named plaintiff's

16  plea that he is a proper class representative under Rule 23(a)."  Gen. Tel. Co. of

17  the Sw. v. Falcon, 457 U.S. 147, 160 (1982) (citations and internal quotation

18  marks omitted); see also  Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,

19  259 F.3d 154, 168 (3d Cir. 2001) ("In reviewing a motion for class certification, a

20  preliminary inquiry into the merits is sometimes necessary to determine whether

21  the alleged claims can be properly resolved as a class action.").  The proponent of

22  the class bears the burden of demonstrating that class certification is appropriate.

23

24    [4]  In 2003 this language was adopted to replace the former guideline: "as soon as

25  practicable after commencement of an action."  Fed. R. Civ. P. 23(c)(1)(A), Advisory
   Committee Notes, 2003 Amendments.  This change reflects the view that additional

26  time may be required to conduct discovery.  "A critical need is to determine how the
   case will be tried.  An increasing number of courts require a party requesting class

27  certification to present a 'trial plan' that describes the issues likely to be presented at

28  trial and tests whether they are susceptible of class-wide proof."  Id.

1 | In re N.D. Cal., Dalkon Shield IUD Prods. Liab. Litig., 693 F.2d 847, 854 (9th Cir.

2 | 1982) (citation omitted).

3 |

4 | ### III. EVIDENTIARY ISSUES

5 | #### A. Plaintiffs' Evidentiary Objections to POS Data Summary Charts

6 | On April 7, 2006, Plaintiffs filed their Evidentiary Objections to POS Data

7 | Summary Charts (Exs. 35 & 36 to Gray Decl.). Plaintiffs challenge these

8 | summary charts of Point of Sale data reflecting total time spent by assistant

9 | managers at the register and time spent completing customer transactions. (Gray

10 | Decl. ¶ 38.) The charts summarize the time spent by each assistant manager in

11 | eight different Wal-Mart stores, broken down by month. Although Plaintiffs

12 | challenge the exhibits as hearsay, the Court finds that they are admissible as

13 | business records under Federal Rule of Evidence 803(6). Plaintiffs also point to

14 | several discrepancies between the charts and Wal-Mart's own employment

15 | records. These discrepancies do not affect the admissibility of the charts. In any

16 | case, the Court does not rely on the charts in ruling on Plaintiffs' Motion for Class

17 | Certification; thus any inaccuracy in the charts will not prejudice Plaintiffs.

18 |

19 | #### B. Defendant's Motion to Strike Declarations of Undisclosed Witnesses

20 | Defendant's Motion to Exclude Declarations of Undisclosed Witnesses was

21 | filed on March 15, 2006. Plaintiffs' opposition was filed on April 3, 2006;

22 | Defendant's reply was filed on April 10, 2006.

23 | Defendant argues that the 129 AM Declarations should be excluded because

24 | Plaintiffs: (1) did not disclose the names and addresses of the declarants in their

25 | initial disclosure under Federal Rule of Civil Procedure 26(a)(1) or in response to

26 | Defendant's discovery requests; and (2) Plaintiffs did not supplement the initial

27 | disclosure or responses to interrogatories to include the declarants' names, as

28 |

1   required by Rule 26(e). Rule 37 provides for the exclusion of undisclosed

2   evidence as a sanction for violating Rule 26; however, a court does have discretion

3   to impose "other appropriate sanctions," either in addition to or instead of

4   exclusion. Fed. R. Civ. P. 37(c)(1). Even undisclosed evidence should not be

5   excluded "if the parties' failure to disclose the required information is

6   substantially justified or harmless." Yeti by Molly Ltd. v. Deckers Outdoor Corp.,

7   259 F.3d 1101, 1106 (9th Cir. 2001) (citing Fed. R. Civ. P. 37(c)(1)).

8       Plaintiffs stated in both their initial disclosure and their responses to

9   Defendant's interrogatories that current and former assistant managers were likely

10  to have relevant information. (Gray Decl. Ex. 38 at 443, Ex. 39 at 461.) However,

11  they did not identify any of the 129 declarants by name until the Motion for Class

12  Certification was filed. The Court finds that Plaintiffs improperly failed to

13  disclose the names of the individual declarants once they became known to

14  Plaintiffs. See Watts v. Healthdyne, Inc., No. 94-2195-EEO, 1995 U.S. Dist.

15  LEXIS 9818, at *2 (D. Kan. June 29, 1995) (rejecting argument that initial

16  disclosure designating "'all present and former employees' of defendants" was

17  sufficient). The Court also finds that Plaintiffs' failure to disclose the declarants'

18  names was unjustified and prejudicial to Defendant.

19      However, the Court declines to exclude the declarations. Any prejudice to

20  Defendant may be cured by reopening discovery for the limited purpose of

21  allowing depositions of the declarants whose names had not been disclosed. See

22  Fitz, Inc. v. Ralph Wilson Plastics Co., 174 F.R.D. 587, 591 (D.N.J. 1997)

23  (allowing moving party to depose undisclosed declarants and submit supplemental

24  briefing); Watts, 1995 U.S. Dist. LEXIS 9818, at *5 (reopening discovery to allow

25  deposition of undisclosed witness). At oral argument, the Court offered the

26  Defendant the opportunity to depose the declarants; Defendant preferred to

27

28

1   proceed with the Motion for Class Certification as scheduled.  Therefore, the

2   Court will not delay its ruling.

3          Defendant offers two other grounds for excluding some of the declarations.

4   Declarant Jason O. Hough states that he was employed by Defendant from

5   February 2, 1990 to January 7, 2000.  Because he was not employed by Defendant

6   during the class period, his declaration is excluded.  The Court also strikes the

7   declarations of Michael Manhollan, Linda Fitchlee, Marilyn Habay, Riki Lepori,

8   Marsha Lyons, Karl Moser, Melvin Quinney, Mercedes Weston, and Brian

9   Williams; each is either unsigned or undated in violation of 28 U.S.C. § 1746.[5]

10

11          **C. Motion to Exclude Declaration and Report of Dr. David I. Levine**

12          Defendant's Motion to Exclude the Declaration and Report of Dr. David I.

13   Levine was filed on March 15, 2006.  Plaintiffs' opposition was filed on April 3,

14   2006; Plaintiffs also rely on the supporting Declaration of David I. Levine

15   ("Levine Decl. Re: Motion to Exclude") and the Declaration of Lawrence C.

16   DiNardo ("DiNardo Declaration") filed on the same date.  Defendant's reply was

17   filed on April 10, 2006.

18          Federal Rule of Evidence 702 allows expert witness testimony if "(1) the

19   testimony is based upon sufficient facts or data, (2) the testimony is the product of

20   reliable principles and methods, and (3) the witness has applied the principles and

21   methods reliably to the facts of the case."  In Daubert v. Merrell Dow

22   Pharmaceuticals, 509 U.S. 579, 589 (1993), the Supreme Court explained that "the

23   trial judge must ensure that any and all scientific testimony or evidence admitted is

24   not only relevant, but reliable."  Courts consider such factors as: "(1) whether the

25

---

26   [5] Defendant challenges the declarations of Craig Blish, Michelle Dougherty Brown,
     and Melba C. Williams on the same grounds.  However, Plaintiffs have submitted
27   additional declarations from these three individuals remedying the defect. (Supp.
28   Drexler Decl. Ex. B.)

7

1   method has gained general acceptance in the relevant scientific community . . . ,

2   (2) whether the method has been peer-reviewed, (3) whether the method 'can be

3   (and has been) tested,' and (4) whether there is a 'known or potential rate of

4   error.'" Lust by & Through Lust v. Merrell Dow Pharms., 89 F.3d 594, 597 (9th

5   Cir. 1996).

6       Some courts apply a more lenient standard at the class certification stage.

7   See Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites,

8   Inc., 209 F.R.D. 159, 162 (C.D. Cal. 2002). However, "[a] district court must

9   ensure that the basis of the expert opinion is not so flawed that it would be

10   inadmissible as a matter of law." Mastermoney Antitrust Litig. v. Visa U.S.A.

11   Inc., 280 F.3d 124, 135 (2d Cir. 2001).

12      Levine's principal conclusion is that assistant managers' activities and

13   duties are largely uniform, because of Wal-Mart's use of standard operating

14   procedures and performance monitoring systems. (Levine Report 2.) Defendant

15   contends that the Levine Report should not be considered because Levine did not

16   collect and study actual data to test his hypothesis. Whether the theory or

17   technique can be or has been tested is a key question. Daubert, 509 U.S. at 593.

18   Levine asserts that he could test his hypothesis by gathering survey data regarding

19   the actual activities of assistant managers. (DiNardo Decl. Ex. 2 at 128:1-22;

20   Levine Decl. Re: Mot. to Exclude ¶ 19.) Levine's failure to test his hypothesis

21   does not necessarily mandate exclusion of his opinion at this stage in the

22   proceeding, though it does detract from the weight attributed to it by the Court.

23      Defendant argues convincingly that Plaintiffs' AM declarations contradict

24   Levine's conclusion, because those declarations themselves show wide variation

25   in the amount of time spent on AM work. But Defendant's objections "go to the

26   weight, rather than the admissibility of the evidence." Dukes, 222 F.R.D. 192.

27   While the Court agrees that the Levine Report is not persuasive, as discussed

28

8

1 | below, the Court will nonetheless consider the Report in ruling on the Motion for

2 | Class Certification.[6]

3 |

4 | ### B. Plaintiffs' Motion to Exclude Declaration of Ali Saad, Ph.D.

5 | On April 3, 2006, Plaintiffs filed a Motion to Exclude Declaration of Ali

6 | Saad, Ph.D. Defendant's opposition was filed on April 10, 2006; Plaintiffs' reply

7 | was filed on April 17, 2006.

8 | The Court first notes that, notwithstanding Plaintiffs' timeliness objection, it

9 | has considered the Supplemental Saad Declaration and the DiNardo Declaration

10 | filed in support of Plaintiffs' opposition.[7] Saad's report, attached as Exhibit 1 to

11 | the Supplemental Saad Declaration ("Saad Report") establishes his qualifications

12 | as an expert. (Saad Report ¶ 5.)

13 | Plaintiffs object to Saad's statements concerning the amount of time spent

14 | on exempt activities. Plaintiffs contend that Saad is not qualified to determine

15 | what activities are exempt; that he offers improper opinions on the merits; and that

16 | any such statements are premature at this stage. Saad has explained, however, that

17 | the decision as to whether each activity was exempt or non-exempt was made by

18 | Defendant's counsel, not by him. (Saad Report ¶ 20 n.13.) Saad explicitly states

19 | that he "offer[s] no opinion" as to the exempt or non-exempt designation. (Id.)

20 | Furthermore, while Saad was asked to determine whether most assistant managers

21 | spend more than half of their time on exempt duties, this was only part of his goal.

22 | (Saad Decl. ¶ 3.) Saad also aimed to determine the variability in how assistant

23 | managers perform their jobs, whether "the data is consistent with a hypothesis that

24 |

---

25 | [6] Plaintiffs cannot rely on the Levine Report to establish facts. In re Citric Acid Litig.,
191 F.3d 1090, 1102 (9th Cir. 1999) ("[A]n expert report cannot be used to prove the

26 | existence of facts set forth therein." citations omitted).

27 | [7] Because the Court does not rely on Exhibits 3 and 4 to the DiNardo Declaration, the

28 | Court need not rule on Plaintiffs' hearsay objection to those exhibits.

1  common policies and procedures cause putative class members to allocate their
2  time in a highly similar manner," and whether there are statistical relationships
3  between the way assistant managers allocate their time and certain store or
4  workforce characteristics. (Id.) These questions do not necessarily depend on the
5  exempt or non-exempt designations of various tasks.

6       Plaintiffs also contend that the Court should exclude the Saad Declaration
7  because it was not based on reliable data. The Saad Report is based in part on an
8  observational study, conducted between August 15, 2005 and September 10, 2005,
9  in which a team of observers watched 18 assistant managers in different California
10 stores, following the assistant managers around the stores and recording all of
11 their activities on hand-held computers. The Saad Report is also based on a
12 survey questionnaire mailed to all current and former assistant managers in
13 October 2005. (Saad Decl. Ex. 2.) Plaintiffs point out several sources of bias in
14 the data. First, a number of the assistant managers being observed thought they
15 were being singled out for observation of their own work. (Mot. Re: Saad Decl.
16 10:7-10.) More generally, assistant managers probably modified their behavior to
17 some extent because they were being observed. (Id. at 10:15-25.) Next, Plaintiffs
18 suggest that the sample size of the study was too small and the duration too short
19 to provide meaningful conclusions. (Id. at 10:10-14.) Plaintiffs also contend that
20 there may have been problems with the observers themselves: they knew that the
21 study was being conducted for Wal-Mart to measure exempt work, they may not
22 have had previous experience on similar projects, and they may have had
23 difficulties with the software used in the study. (Id. at 11:4-13.) Finally, Plaintiffs
24 argue that the survey respondents may have been biased either by the survey form
25 or by other communications received from Plaintiffs or from Wal-Mart. (Id. at
26 11:22-28.)

27
28

1    These factors may impact the weight the Court gives to the Saad Report;

2    however, they do not render the report inadmissible as expert testimony.  In any

3    case, the Court does not rely on the Saad Report in its ruling; the AM declarations

4    submitted by Plaintiffs are sufficient to show a great deal of variation in assistant

5    manager duties.

6

7                                    **IV. <u>FACTUAL BACKGROUND</u>**

8    The Court accepts the following facts as true for purposes of this Motion

9    only.

10

11   **A. <u>Organization</u>**

12   Defendant Wal-Mart is a retailer with its main corporate office, or home

13   office, in Bentonville, Arkansas.  (Drexler Decl. Ex. 1 at 110:19-20.)  Wal-Mart

14   stores are grouped into large "divisions," then smaller "regions" within each

15   division, and finally "districts" within each region, with each district containing

16   six to ten stores.  (<u>Id.</u> Ex. 2 at 18:22-24, 217:22-219.6; Ex. 16.)  Defendant

17   operates over 160 stores in California.  (Gray Decl. Ex. 13 at 29:12-30:5.)  Wal-

18   Mart's Division A covers California and several other states.  (Drexler Decl. Ex. 4

19   at 19:25-20:7.)  California stores are divided into two regions, with Northern

20   California stores in Region 19 and Southern California stores in Region 16.  (<u>Id.</u>

21   Ex. 5 at 18:20-19:12.)

22   Each district has a district manager ("DM") with his or her office at one of

23   the stores in the district.  (Drexler Decl. Ex. 2 at 19:4-9; Ex. 16.)  Within the

24   district, each store has one store manager ("SM"); some stores also have one or

25   two co-managers ("CoMs").  (<u>Id.</u> Ex. 6 at 44:16-45:8.)  Each store also has several

26

27

28

1  assistant managers ("AMs"). (Id. Ex. 2 at 172:20-173:1.) Each store employs a

2  number of hourly associates[8] who are supervised by store management.

3          Most of the California stores are so-called "Division 1" stores, consisting of

4  the main store area and several smaller specialty areas such as Photo or Tire Lube

5  Express; however, California also has a few Wal-Mart "Supercenters," which are

6  similar to Division 1 stores but also contain a grocery section. (Drexler Decl. Ex.

7  5 at 32:16-18; Ex. 7.) The main area of each store has a number of separate

8  merchandise departments including "softlines" (apparel and related departments),

9  "hardlines" (hardware and related departments), and home lines. (Id. Ex. 5 at

10  32:13-16.) The "front end" of each store includes cash registers, a customer

11  service counter, a layaway counter, and cart pushers and greeters. (Id. Ex. 5 at

12  194:11-196:25; Ex. 8 at 97:17-98:8.) The "back office" area of each store

13  includes several offices and a training room. (Id. Ex. 9 at 45:6-46:4.) Each store

14  also has a stockroom. (Id. Ex. 2 at 85:17-86:8.)

15          Each SM is responsible for his or her entire store. (Drexler Decl. Ex. 3 at

16  50:24-25.) In contrast, each AM is assigned to work in one area of the store at a

17  time, such as the hardlines, softlines, the front end, operations (or the back office),

18  or the overnight shift. (Id. Ex. 2 at 42:25-43:17; Ex. 5 at 31:25-32:21.) AMs with

19  specialty training are assigned to the specialty areas. (Id. Ex. 5 at 32:16-18.)

20

21  **B. Centralized Decision-Making**

22          From its home office, Defendant establishes many standard operating

23  procedures, metrics, and performance targets to run its stores.

24          The home office decides what merchandise is sold in Wal-Mart stores;

25  while a store may stock some additional merchandise not sold in other stores, only

26  ────────────────────

27  [8] Wal-Mart refers to all of its employees as "associates." Hourly associates are non-

28  salaried employees. (Mot. 4 n.6.)

1   approved merchandise may be sold. (Drexler Decl. Ex. 10 at 91:21-92:8; Ex. 11 at

2   46:5-9.)  The display arrangements for merchandise are also set by the home office

3   through "modulars," or detailed display plans, issued to each store. (Id. Ex. 3 at

4   316:15-317:6; Ex. 10 at 85:19-86:10; Ex. 11 at 153:20-154:5.)  The store

5   management does have some discretion to make minor changes to the modular or

6   to create its own modulars for seasonal merchandise or "flex spaces." (Id. Ex. 3 at

7   316:10-25; Ex. 11 at 154:11-155:12.)

8        Prices are set primarily by the home office.  The home office begins by

9   setting base prices for all merchandise. (Drexler Decl. Ex. 6 at 131:19-132:1.)

10  Then a store may make adjustments to account for local competitors, based on

11  guidelines issued by the home office. (Id. Ex. 2 at 191:24-192:25; Ex. 6 at 132:1-

12  3; Ex. 10 at 43:18-23.)  "Rollbacks," or price reductions, are set by the home

13  office. (Id. Ex. 6 at 132:18-20; Ex. 11 at 146:20-147:6; Ex. 14 at 123:12-14.)

14       The home office receives information about computer transactions in every

15  store, including cash register sales, employees logging in or out of registers,

16  employees clocking in or out, and inventory scanning. (Drexler Decl. Ex. 2 at

17  202:15-20; Ex. 13 at 29:24-30:9, 79:7-13.)  Many, though not all, items are kept in

18  stock through a "perpetual inventory" system, whereby items are reordered

19  automatically once a store has sold a certain quantity. (Id. Ex. 2 at 202:15-203:5;

20  Ex. 3 at 344:11-17.)  AMs are to some degree responsible for ensuring that items

21  are ordered when necessary. (Gray Decl. Ex. 48 ¶ 3.)

22       The home office controls many aspects of the physical environment in Wal-

23  Mart stores, including the fixtures, store temperature, food storage temperature,

24  and music. (Drexler Decl. Ex. 10 at 85:2-18; Ex. 12 at 51:15-54:13.)  The home

25  office provides directions for setting signs throughout each store, though some

26  signage decisions are made locally. (Id. Ex. 8 at 89:6-8; Ex. 21.)

27

28

1    SMs, DMs, and regional managers routinely tour their stores to ensure

2  adherence to Wal-Mart standards and policies. (Drexler Decl. Ex. 2 at 18:12-21,

3  19:10-20:11.)  Each store is thoroughly audited periodically using a Store Total

4  Activity Review ("STAR") audit or the newer "Operational Dashboard" report.

5  (Id. Exs. 27, 30).

6    Wal-Mart emphasizes the importance of the Wal-Mart culture through

7  printed materials and other means. (Drexler Decl. Exs. 32-34.)  Daily store

8  meetings are closed with the Wal-Mart cheer.  (Id. Ex. 5 at 227:10-25.)

9

10  **C. AM Training and Duties**

11    All AMs are trained in a uniform 17-week training program that includes

12  formal instruction from a standard set of written materials and computer-based

13  learning ("CBL") modules. (Drexler Decl. Ex. 5 at 31:11-34:2, 51:15-19; Ex. 31.)

14  The program, known as the Management Training Program ("MTP"), takes place

15  at a specific training store. (Id. Ex. 10 at 45:4-6; Ex. 16 at 55:4-7.)  During the

16  MTP, AM trainees are instructed in four common areas: "people," "operations,"

17  "merchandising," "Leadership 101." (Id. Ex. 5 at 31:11-24.)  They also receive

18  area-specific training.  (Id. Ex. 5 at 31:11-32:21.)

19    The training program is designed in such a way that a competent AM trainee

20  would have the fundamental foundation or basic skills to be an AM in any other

21  store. (Drexler Decl. Ex. 4 at 41:20-42:6; Ex. 5 at 63:9-23.)  AMs are often

22  transferred between stores. (See, e.g., Alvarez AM Decl. ¶¶ 3, 6.)  An AM

23  transferred to another store may or may not receive additional training. (Drexler

24  Decl. Ex. 3 at 1:21-62:25.)  Defendant also has a practice of routinely rotating

25  AMs through all different store areas over time. (Drexler Decl. Ex. 2 at 45:18-22;

26  Ex. 7 at 40:17-23; Ex. 10 at 57:7-18; Ex. 11 at 26:6-10.)  AMs do not generally

27  receive additional training when they are rotated to another area of the store,

28

1   except for occasional CBL modules provided by the home office. (See, e.g.,

2   Aldridge AM Decl. ¶ 6.)

3       AMs are evaluated using a standard form. (Drexler Decl. Ex. 39.) All AMs

4   are in the same program for pay bonuses. (Id. Ex. 5 at 129:19-132:19, 150:19-

5   151:16.)

6       AMs have a number of distinct duties. AMs tour each store to oversee its

7   operations and make notes, and review store operational reports. (Gray Decl. Ex.

8   3 at 301:12-03:22; Ex. 9 at 27:10-29:21, 149:13-50:18; Ex. 21 at 90:12-93:8.)

9   Some AMs visit competing stores to compare their operations. (Id. Ex. 11 at

10  132:10-21; Ex. 12 at 173:25-174:19.) AMs are responsible for counting or

11  verifying cash deposits and locking or unlocking doors. (See, e.g., Aadnesen AM

12  Decl. ¶ 27.)

13      AMs are responsible for supervising a few hourly associates or as many as

14  200 or more, depending on the store and the assignment within the store. (Gray

15  Decl. Ex. 4 at 125:4-11; Ex. 19 at 48:3-14; Ex. 51 ¶ 13; Ex. 69 ¶ 5.) Some AMs

16  set their own priorities for their area and their own time, and direct the work of

17  their subordinates to accomplish those tasks. (Id. Ex. 2 at 145:5-13, 245:10-17;

18  Ex. 48 ¶ 16; Ex. 68 ¶¶ 5, 11; Ex. 77 ¶ 6.) SMs determine store budgets and set

19  hours for store associates; AMs participate in preparing work schedules. (See,

20  e.g., Aadnesen AM Decl. ¶¶ 11, 18-19.) Some AMs have the authority to schedule

21  hours beyond the preferred staffing guidelines and to make overtime decisions;

22  others do not. (Gray Decl. Ex. 7 at 179:18-80:5, 259:20-60:22; Ex. 12 at 158:24-

23  59:7; Ex. 62 ¶ 12.) AMs often run daily meetings with all store associates at

24  which they report sales numbers, recognize birthdays and anniversaries, announce

25  upcoming events, read directions from the home office, and lead the Wal-Mart

26  cheer. (See, e.g., Aadnesen AM Decl. ¶ 27.)

27

28

1    With the participation of other management employees, AMs conduct

2  performance evaluations of hourly associates, discipline them, recommend them

3  for merit-based pay increases, train them for promotion, and investigate customer

4  and associate accidents. (Id. Ex. 2 at 65:14-22, 145:5-13; Ex. 4 at 150:6-22;

5  251:2-52:14; 276:12-79:3; 302:14-04:6; 306:10-07:18; 324:21-30:6.)

6    SMs may delegate hiring authority to some, all, or none of their AMs.

7  (Gray Decl. Ex. 45 ¶ 13; Ex. 48 ¶ 6; Ex. 56 ¶ 5; Ex. 67 ¶ 3; Ex. 71 ¶ 3.) At least

8  some AMs also have the authority to promote a sales associate to department

9  manager, an hourly position. (Id. Ex. 7 at 237:12-19; Ex. 9 at 195:19-197:11.)

10  AMs conduct interviews of job applicants, though they often use questions

11  prepared by the home office. (See, e.g., Aldridge AM Decl. ¶ 27.)   Some AMs are

12  authorized to terminate hourly associates without consulting the SM in cases of

13  extreme misconduct. (Gray Decl. Ex. 3 at 242:17-22; Ex. 9 at 194:8-195:18; Ex.

14  12 at 191:13-92:5.)

15    According to the AM declarations submitted by Plaintiffs, in addition to the

16  duties listed above, AMs are expected to tour the store and make notes to be

17  discussed with other associates; review reports of sales, wages, profit, and

18  merchandise shrinkage; handle transactions that require manager approval; and

19  help customers who request a manager. (See, e.g., Aadnesen AM Decl. ¶ 11.)

20  AMs also engage in the following duties: helping or greeting customers; customer

21  service assistance; working on a cash register; cleaning up the store; retrieving

22  merchandise from the back room or upper shelves; working the layaway desk;

23  stocking shelves or straightening merchandise; unloading and moving

24  merchandise; driving a forklift; assembling or repairing merchandise; retrieving

25  merchandise from an off-site warehouse; processing returns, refunds and

26  exchanges; collecting shopping carts; and changing security videotapes. (See,

27  e.g., Aadnesen AM Decl. ¶ 9.) AMs were instructed that they should do whatever

28

1  was needed to make sure that the work of hourly associates was completed. They

2  understood that to include doing such work themselves, (see, e.g., id. ¶ 15), though

3  no declarant states he/she was specifically told that.

4      The AM declarations are of questionable value in that they fail even to

5  establish the premise for which they were submitted. They are clearly documents

6  drafted (not surprisingly) by Plaintiffs' counsel and appear designed to have

7  certain "blanks" filled in by the AMs – such as the amount of time spent on what

8  Plaintiffs' counsel apparently hope will eventually be classified as non-exempt

9  tasks. Because most of these tasks have been grouped in a single paragraph, and

10  the percentage of time attributed to those tasks (sometimes several years after the

11  fact) applies to the tasks as a whole, the appearance of so much as a single exempt

12  task in the declaration seriously impacts the value of the declaration. Moreover,

13  the AMs seem to consider any task performed by an hourly employee to be a non-

14  exempt task. That is not the law. Hourly employees may perform exempt tasks

15  from time to time.

16      Wal-Mart has classified AMs as exempt since the position was created.

17  (Drexler Decl. Ex 4 at 19:8-17.) Only two studies have been conducted

18  concerning actual AM duties, both in response to litigation: a 2002 study by the

19  Webb Group, and the more recent study described in the Saad Report. (Id. Ex. 1 at

20  50:14-52:16, 70:21-71:25; Ex. 4 at 31:14-24, 36:17-37:17; Ex. 40.)

21      In general, AMs are required to implement all Wal-Mart policies and

22  procedures, including weekly priority notes from the home office. (Drexler Decl.

23  Ex. 9 at 38:11-20, 43:3-11; Ex. 11 at 29:5-15.) However, Defendant contends that

24  AM duties vary widely by store or management team. Wal-Mart stores differ in

25  the size and composition of the hourly workforce and management structure, the

26  size and sales volume of the store, store location, hours of operation, the age and

27  experience of store associates, the age of the store, and shrink levels. (Id. Ex. 13

28

17

1   at 66:13-67:21.)  These differences may affect AM duties.  For instance, if a store

2   does not have a CoM, AMs will spend more time verifying operational reports.

3   (Id. Ex. 48 ¶ 17.)  In a store with more experienced associates, an AM is required

4   to do less training or planning.  (Id. Ex. 13 at 236:23-241:16; Ex. 63 ¶ 3.)

5   Conversely, a store with high turnover will require more time spent on personnel

6   duties.  (Id. Ex. 58 ¶¶ 11-12; Ex. 68 ¶ 7.)  If a store has fewer AMs, each AM will

7   have a larger assigned area and will need to spend more time on short-term tasks

8   or on the sales floor.  (Id. Ex. 71 ¶ 8; Ex. 79 ¶ 13.)  An AM who supervises more

9   hourly associates will tend to spend more time on personnel-related tasks such as

10   evaluations, hiring, promoting, and coaching.  (Id. Ex. 56 ¶ 5; Ex. 78 ¶ 7; Ex. 80 ¶

11   5.)  AMs in multi-story stores spend more time on safety, maintenance, and theft

12   issues.  (Id. Ex. 64 ¶ 5.)  In high volume stores, AMs spend more time on

13   merchandising duties and decisions.  (Id. Ex. 50 ¶ 6; Ex. 56 ¶ 2.)  In high-shrink

14   stores, AMs spend more time on shrink control and loss prevention.  (Id. Ex. 71 ¶

15   7.)  AM duties may even change seasonally; during busy periods, AMs focus on

16   short-term planning and touring their areas rather than long-term planning.  (Id.

17   Ex. 13 at 234:8-14.)

18        Individual DMs and SMs maintain different practices with respect to AMs.

19   One DM required AMs to complete profit and loss planning balance sheets and

20   action plans, and held meetings and conference calls with the AMs.  (Gray Decl.

21   Ex. 3 at 226:1-31:2; Ex. 4 at 264:12-65:11; Ex. 11 at 95:2-25; Ex. 21 at 112:21-

22   117:22; Ex. 33; Ex. 34.)  He also developed his own additional criteria for

23   evaluating AMs in his district.  (Id. Ex. 11 at 189:1-92:11; Ex. 21 at 207:1-08:22;

24   Ex. 31.)  Another DM developed his own supplemental training program for AMs.

25   (Id. Ex. 61 ¶ 6.)  Some SMs delegate more responsibility to AMs, while others

26   may follow up more closely and take a more hands-on approach.  (Id. Ex. 44 ¶ 3;

27

28

18

Ex. 45 ¶ 16; Ex. 62 ¶ 3; Ex. 68 ¶ 5.)  SMs may create their own methods for
evaluating AMs.  (Id. Ex. 78 ¶ 10.)

The frequency of AM rotations among different store areas varies by store,
leading to differences in AMs' daily duties.  (See, e.g., Gray Decl. Ex. 6 at 25:25-
26:10; Ex. 13 at 59:19-60:6; Ex. 78 ¶ 11.)  Some stores assign a particular AM to
operations; in other stores, there is no AM assigned to operations, leaving all AMs
to share the responsibility for supervising the business offices and verifying
operational reports.  (Id. Ex. 78 ¶ 14.)  AMs on the overnight assignment also have
different duties from other AMs.  An overnight AM will often be the only
managerial employee in the store, and will have to make all management decisions
during that time; however, the overnight AM will be less involved in interviewing,
hiring, and customer issues.  (Id. Ex. 43 ¶¶ 4-6; Ex. 54 ¶ 6; Ex. 66 ¶ 3; Ex. 68 ¶ 4;
Ex. 76 ¶¶ 6-7; Ex. 78 ¶ 8; Ex. 80 ¶ 7.)

Some California stores have special defined AM roles that do not exist in
most other stores.  These may include a Personnel AM (Gray Decl. Ex. 77 ¶ 5); a
Specialty Groups AM (id. Ex. 78 ¶ 3); a Closing AM who is responsible for the
transition between the day and evening shifts (id. Ex. 48 ¶ 15); or Training AMs
(id. Ex. 16 at 34:3-13; Ex. 51 ¶¶ 3, 10; Ex. 61 ¶ 8; Ex. 68 ¶ 9).  In stores built and
opened after July 19, 2004, there is a separate front end AM position.  (Gray Decl.
Ex. 18 at 207:5-08:23.)

Some AMs in Wal-Mart Supercenters may have job duties different from
those in Division 1 stores because of the additional store areas; indeed, the Levine
Report focused only on the main store area and did not cover AMs in the specialty
areas or in the grocery section of Supercenters.  (Levine Report 3 n.4.)

California AMs regularly work an average of 52 hours per week (Drexler
Decl. Ex. 43), and may work 80 hours or more per week during busy periods (see,
e.g., Aadnesen AM Decl. ¶ 16).  However, AMs are not paid for overtime.  (See,

19

1  e.g., id. ¶ 17.)  Nor are they given wage and hour statements.  Many AMs rarely

2  receive uninterrupted breaks.  (See, e.g., id. ¶ 22.)

3

### D. The Putative Class Representatives

5      The named Plaintiffs are Daniel Sepulveda and Antonio Prangner.[9]

6  Sepulveda began his AM training in 1998 in Pleasanton, California.  (Sepulveda

7  Decl. ¶¶ 2-3.)  He has worked in four California stores and also completed a

8  temporary six-week assignment at a Supercenter store in Washington.  (Id. ¶¶ 3-4.)

9  As an AM, Sepulveda was rotated through the overnight/receiving, softlines,

10 hardlines, front end, and operations AM assignments.  (Id. ¶¶ 3-4.)  He was also

11 involved in setting up two new stores.  (Id. ¶ 3.)  Sepulveda was consistently rated

12 as meeting or exceeding Defendant's expectations; at one point he was named a

13 "Rising Star" AM.  (Id. ¶¶ 3-4.)  Sepulveda left his employment with Defendant

14 voluntarily to become a California Highway Patrol Officer.  (Id. ¶¶ 4-5.)

15      Prangner is a current Wal-Mart AM employee, though he is currently on a

16 leave of absence due to a work-related injury.  (Prangner Decl. ¶¶ 2, 30.)  He

17 began his AM training in 1999.  (Id. ¶ 2.)  He has been assigned to eight different

18 Wal-Mart stores, including six in California.  (Id. ¶ 3.)  As an AM, Prangner was

19 rotated through the overnight/receiving, softlines, hardlines, homelines, and front

20 end AM assignments.  (Id. ¶ 4.)  Prangner was consistently rated as meeting or

21 exceeding Defendant's expectations.  (Id. ¶ 3.)

22

23

24

25

26

_____

27  [9]  Although Anita Perez was originally a named Plaintiff, she no longer seeks to be a

28  class representative.  (Reply 12 n.10.)

# V. <u>ANALYSIS</u>

## A. <u>Statutory and Administrative Background</u>

California Labor Code § 510(a) requires overtime pay for any work over eight hours in one workday, over 40 hours in one workweek, or on the seventh day of work in one workweek, subject to certain exceptions.  Wage Order 7-2001 promulgated by the California Industrial Welfare Commission ("IWC") sets out similar requirements for persons employed in the mercantile industry.  Cal. Code Regs. tit. 8, § 11070, subd. 3.(A)(1).

The IWC is empowered to establish exemptions from the overtime pay requirements of California Labor Code § 510 "for executive, administrative, and professional employees."  Cal. Lab. Code § 515(a).  An exempt employee must be "primarily engaged in the duties that meet the test of the exemption, customarily and regularly exercise[] discretion and independent judgment in performing those duties, and earn[] a monthly salary equivalent to no less than two times the state minimum wage for full-time employment."  <u>Id.</u>  The term "primarily" means "more than one-half of the employee's worktime."  Cal. Lab. Code § 515(e).  Under Wage Order 7-2001, executive employees are exempted from the overtime pay requirements of the order.  Cal. Code Regs. tit. 8, § 11070, subd. 1.(A).  An executive employee is one whose duties involve management of the enterprise; who regularly supervises two or more employees; who has the authority to hire or fire other employees or to make meaningful recommendations as to hiring, firing, advancement, and promotion; who regularly exercises managerial discretion, and who is primarily engaged in exempt duties, as defined by federal regulations.  Cal. Code Regs. tit. 8, § 11070, subd. 3.(A)(1).

California Labor Code § 512(a) provides for a mandatory 30-minute meal break in each five-hour work period, or two meal breaks in each ten-hour work

21

period, again subject to certain exceptions.  An employer who fails to provide a required meal or rest period must pay a penalty to the employee.  Cal. Lab. Code § 226.7(b).  Wage Order 7-2001 includes similar provisions for mandated meal periods and penalties.  Cal. Code Regs. tit. 8, § 11070, subd. 11.(A).  In addition, Wage Order 7-2001 provides for a rest period in the middle of every work period, generally at the rate of ten minutes rest time for every four hours worked; failure to provide a rest period subjects the employer to a penalty.  Cal. Code Regs. tit. 8, § 11070, subd. 12.  An employer may not require any employee to work during any meal or rest period mandated by an IWC order.  Cal. Lab. Code § 226.7(a).  However, executive employees are exempt from the meal and rest period requirements of Wage Order 7-2001.  Cal. Code Regs. tit. 8, § 11070, subd. 1.(A).

Under California Labor Code § 226(a), an employer is required to provide each employee with an accurate itemized wage and hour statement, unless the employee is exempt under § 515 or any IWC order.  Under California Labor Code §§ 201-203, an employer is required to make prompt payment of wages if the employee quits or is discharged.

### B. Rule 23(a)

Plaintiffs must first show that the four prerequisites of Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation – are met.

### 1. Numerosity

Under Rule 23(a)(1), a class action may be maintained only if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  In determining whether joinder would be impracticable, a court should consider not only the number of class members, but also "the nature of the action, the size of the individual claims, [and] the inconvenience of trying individual

1   suits." Wang v. Chinese Daily News, 231 F.R.D. 602, 606 (C.D. Cal. 2005)

2   (citing Jordan v. County of Los Angeles, 669 F.2d 1311, 1319 (9th Cir. 1982),

3   vacated on other grounds, 459 U.S. 810 (1982)).  Although the number of class

4   members is not necessarily the deciding factor, "'where a class is large in numbers,

5   joinder will usually be impracticable.'"  Wang, 231 F.R.D. at 606 (quoting Jordan,

6   669 F.2d at 1319).

7        Plaintiffs contend that there are approximately 2,750 class members, and

8   that joinder of such a large number of parties would be impracticable.  Defendant

9   does not appear to dispute this conclusion.  The Court finds that the numerosity

10   requirement of Rule 23(a)(1) is met.

11

12            **2. Commonality**

13        Rule 23(a)(2) requires that there be "questions of law or fact common to the

14   class."  Fed. R. Civ. P. 23(a)(2).  The commonality requirement must be

15   "construed permissively."  Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th

16   Cir. 1998).  "All questions of fact and law need not be common to satisfy the rule.

17   The existence of shared legal issues with divergent factual predicates is sufficient

18   . . . ."  Id.  The Ninth Circuit has made clear that Rule 23(a)(2) is more lenient than

19   the related requirement in Rule 23(b)(3) that common questions of fact or law

20   predominate.  Id.; see also Perry v. U.S. Bank, No. C-00-1799-PJH, 2001 U.S.

21   Dist. LEXIS 25050, at *20 (N.D. Cal. Oct. 17, 2001) (finding that Rule 23(a)(2)

22   was satisfied but Rule 23(b)(3) was not).  For purposes of Rule 23(a)(2), the

23   common questions need only exist, even if they are not the predominant questions

24   in the case.  Plaintiffs have identified several common issues of fact, including

25   whether the putative class members were classified as exempt, and if so, on what

26   basis; what Defendant's official policies were regarding AM duties; and whether

27   Defendant adhered to or deviated from those policies in a systematic manner.

28

1     Plaintiffs have also identified common legal questions, including which duties

2     should be classified as exempt. Although the factual basis for each class

3     member's claims will vary based on the class member's individual work

4     experience, the major legal issues and some of the factual questions are the same.

5     "The existence of shared legal issues with divergent factual predicates is

6     sufficient" to satisfy the commonality requirement. Hanlon, 150 F.3d at 1019.

7         A number of courts have found that the commonality requirement of Rule

8     23(a)(2) is satisfied where a putative class of employees challenges the employer's

9     classification of those employees as exempt from overtime requirements under

10    state labor laws. See Wang, 231 F.R.D. at 607-08; Perry, 2001 U.S. Dist. LEXIS

11    25050, at *10-11; Leyva v. Buley, 125 F.R.D. 512, 515-16 (E.D. Wash. 1989).

12    Defendant cites two cases to the contrary. Diaz v. Elecs. Boutique of Am, Inc.,

13    No. 04-CV-0840E(Sr), 2005 U.S. Dist. LEXIS 30382, at *23 (W.D.N.Y. Oct. 17,

14    2005); Morisky v. Pub. Serv. Elec. & Gas Co., 111 F. Supp. 2d 493, 500 (D.N.J.

15    2000). The Court finds the former line of cases more consistent with the Ninth

16    Circuit's lenient standard.[10]

17         The Court finds that Plaintiffs have satisfied the commonality requirement

18    of Rule 23(a)(2).

19

20        **3. Typicality**

21         Rule 23(a)(3) requires that the representative parties' claims be "typical of

22    the claims . . . of the class." Fed. R. Civ. P. 23(a)(3). The rule sets forth a

23    "permissive standard[]": under Rule 23(a)(3), "representative claims are 'typical'

24    if they are reasonably co-extensive with those of absent class members; they need

25

26    _____

27    [10]   Morisky is also distinguishable because the putative class was composed of
employees in a number of different job categories, with only an "extremely broad

28    'general connection'" Morisky, 111 F. Supp. 2d at 498.

1   not be substantially identical." <u>Hanlon</u>, 150 F.3d at 1020.  Rule 23 "does not

2   require the named plaintiffs to be identically situated with all other class members.

3   It is enough if their situations share a common issue of law or fact and are

4   sufficiently parallel to insure a vigorous and full presentation of all claims for

5   relief." <u>Cal. Rural Legal Assistance, Inc. v. Legal Servs. Corp.</u>, 917 F.2d 1171,

6   1175 (9th Cir. 1990).  "Typicality refers to the nature of the claim or defense of the

7   class representative, and not to the specific facts from which it arose . . . ." <u>Hanon</u>

8   <u>v. Dataproducts Corp.</u>, 976 F.2d 497, 508 (9th Cir. 1992) (citation and internal

9   quotation marks omitted).  "The test of typicality is whether other members have

10   the same or similar injury, whether the action is based on conduct which is not

11   unique to the named plaintiffs, and whether other class members have been injured

12   by the same course of conduct." <u>Id.</u> (citation and internal quotation marks

13   omitted).  In practice, "[t]he commonality and typicality requirements of Rule

14   23(a) tend to merge." <u>Gen. Tel. Co. of the Sw.</u>, 457 U.S. at 157 n.13.

15         Sepulveda and Prangner are a former and a current AM employed by

16   Defendant in California during the class period.  Like all other AMs, they were

17   classified as exempt employees.  Their declarations, as previously discussed, bear

18   a strong resemblance to the other AM declarations submitted by Plaintiffs.  Each

19   states that he was required to comply with Wal-Mart's uniform policies and

20   practices (Sepulveda Decl. ¶ 6; Prangner Decl. ¶ 5); that he spent more than 50%

21   of his work time on tasks that were usually performed by hourly employees

22   (Sepulveda Decl. ¶ 9; Prangner Decl. ¶ 8); that he consistently worked more than

23   40 hours per week but was never paid overtime and never received wage and hour

24   statements (Sepulveda Decl. ¶¶ 17-18; Prangner Decl. ¶¶ 16-17); and that he rarely

25   had uninterrupted meal or rest breaks (Sepulveda Decl. ¶ 23; Prangner Decl. ¶ 22).

26

27

28

1      Subject to the factual differences among AM duties discussed below, the

2 Court finds that Sepulveda and Prangner have claims sufficiently typical of the

3 class claims to satisfy Rule 23(a)(3).

4

5                **4. Adequate Representation**

6      Finally, Rule 23(a)(4) requires a showing that "the representative parties

7 will fairly and adequately protect the interests of the class." Fed. R. Civ. P.

8 23(a)(4). This requirement is grounded in constitutional due process concerns;

9 "absent class members must be afforded adequate representation before entry of a

10 judgment which binds them." Hanlon, 150 F.3d at 1020 (citing Hansberry v. Lee,

11 311 U.S. 32, 42-43 (1940)). The Court must resolve two questions: "(1) do the

12 named plaintiffs and their counsel have any conflicts of interest with other class

13 members and (2) will the named plaintiffs and their counsel prosecute the action

14 vigorously on behalf of the class?" Id. (citing Lerwill v. Inflight Motion Pictures,

15 Inc., 582 F.2d 507, 512 (9th Cir. 1978). Both the named plaintiffs and their

16 counsel must have sufficient "zeal and competence" to protect the interests of the

17 rest of the class. Fendler v. Westgate, 527 F.2d 1168, 1170 (9th Cir. 1975). This

18 requirement again tends to merge with the commonality and typicality

19 requirements. Gen. Tel. Co. of the Sw., 457 U.S. at 157 n.13.

20      Plaintiffs do not appear to have any conflicts of interest with other class

21 members, nor does Defendant suggest that any conflicts exist. Instead, Defendant

22 speculates that "Sepulveda and Prangner chose to spend their time performing

23 non-exempt duties to bolster their claims rather than performing managerial

24 duties." (Opp'n 12:27-13:1.) Defendant bases this conjecture on the fact that

25 Sepulveda first began researching and discussing a lawsuit in 2001, three years

26

27

28

before he left his employment with Defendant.[11] (Gray Decl. Ex. 2 at 17:3-21:5; 26:5-31:13; 34:18-37:21; 44:4-10.) However, Defendant has offered no evidence that Sepulveda and Prangner performed their work differently than they otherwise would have. Both routinely received positive evaluations. Sepulveda and Prangner cannot be excluded from representing the putative class for exercising their right to consult with counsel.

Defendant suggests that it has unique defenses against Sepulveda and Prangner based on their purported intentional manipulation of their job duties. The Ninth Circuit has held that "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." Hanon, 976 F.2d at 508 (citations and internal quotation marks omitted). However, Defendant can assert a similar defense against any putative class member. See Basco v. Wal-Mart Stores, Inc., 216 F. Supp. 2d 592, 603 (E.D. La. 2002) (noting that employer accused of requiring off-the-clock work could assert the defense that any given class member "voluntarily chose to engage in such work in deviance of [the employer's policy]"). While the factual circumstances of the defense will vary with each class member, the legal basis will not.

Both Sepulveda and Prangner indicate that they have spent many hours investigating the case, assisting counsel with discovery, and attending settlement conferences. (Sepulveda Decl. ¶ 32; Prangner Decl. ¶¶ 33-34.) Plaintiffs' counsel has experience prosecuting individual and class actions alleging violation of

---

[11] In his declaration, Sepulveda does not suggest that he contemplated a lawsuit prior to 2003. (Sepulveda Decl. ¶ 30.) While the omission is noteworthy, there is no direct contradiction between Sepulveda's declaration and his earlier deposition testimony. Sepulveda also indicated that he may have met with Prangner and Perez as early 2001 during a meeting with Plaintiffs' counsel, though there is some confusion as to the date. (Gray Decl. Ex. 2 at 34:18-37:21.) Prangner stated in his declaration that his "interest in this case began in approximately 2003." (Prangner Decl. ¶ 32.)

1  California labor and unfair competition laws.  (Pearl Decl. ¶ 4; Quisenberry Decl.

2  ¶¶ 3-5.)  Plaintiffs' counsel have devoted substantial time and resources to the

3  matter (Pearl Decl. ¶ 4; Quisenberry Decl. ¶ 6), and have "rigorously prosecuted

4  this action in that they have solicited class members, retained an expert, and

5  conducted research to support their allegations."  Wang, 231 F.R.D. at 609

6  (finding adequacy of representation).

7       Again, although the issue as to Plaintiffs is not free from doubt, the Court

8  finds at this stage that Plaintiffs (and Plaintiffs' counsel) would provide adequate

9  representation for the class members as required by Rule 23(a)(4).

10

11     **C. Rule 23(b)**

12       Having satisfied all four requirements of Rule 23(a), Plaintiffs must now

13  satisfy at least one of the three alternative requirements of Rule 23(b).

14

15       **1. Risk of Inconsistent Judgments**

16       Rule 23(b)(1) allows for certification of a class if "the prosecution of

17  separate actions . . . would create a risk of . . . inconsistent or varying

18  adjudications with respect to individual members of the class which would

19  establish incompatible standards of conduct for the party opposing the class."

20  Fed. R. Civ. P. 23(b)(1).  The Ninth Circuit has adopted an "extremely

21  conservative view," requiring a finding that either "(1) rulings in separate actions

22  would subject defendant to incompatible judgments requiring inconsistent conduct

23  to comply with the judgment; or (2) a ruling in the first of a series of separate

24  actions will 'inescapably alter the substance of the rights of others having similar

25  claims.'"  Mateo v. M/S Kiso, 805 F. Supp. 761, 772 (N.D. Cal. 1991) (quoting

26  McDonnell Douglas Corp. v. U.S. Dist. Ct., C.D. Cal., 523 F.2d 1083, 1086 (9th

27  Cir. 1975)).  Neither would occur here.  "[W]here plaintiffs' claims are for

28

28

1   damages [alone], there is no possibility of judgments posing inconsistent
2   standards." Id. (citing McDonnell Douglas Corp., 523 F.2d at 1086). This strict
3   standard is consistent with the Ninth Circuit's observation that "the stare decisis
4   effect of a ruling in an early action is insufficient to 'inescapably bind' later courts
5   or other members of the putative class" absent res judicata. Id. at 773 (citing La
6   Mar v. H & B Novelty & Loan Co., 489 F.2d 461, 467 (9th Cir. 1973)).

7        Plaintiffs contend that certification is appropriate under Rule 23(b)(1)
8   because in order to make a determination of exempt or non-exempt status, the
9   tasks performed by AMs will have to be classified as exempt or non-exempt; if
10  this determination is made separately for each member of the class, inconsistent
11  judgments may result. See Rothgeb v. Statts, 56 F.R.D. 559, 565 (S.D. Ohio
12  1972) (finding risk of inconsistent judgments in overtime pay case); see also
13  Leyva, 125 F.R.D. at 517 (finding class certification appropriate under Rule
14  23(b)(1)(A) where class members alleged a failure to pay state-mandated
15  minimum wage). The Court is not persuaded.

16       Defendant counters that there is no risk of inconsistent judgments because it
17  can simply treat some members of the AM class as exempt but not others. The
18  Court finds Defendant's view persuasive. Plaintiffs seek injunctive relief and
19  damages. If each class member were to proceed separately, an injunction might
20  (or might not) issue ordering Defendant to reclassify that particular class member
21  as non-exempt based on an individualized analysis of duties performed. In either
22  case, the injunction would not affect the rights of the other AMs. The Court finds
23  that class certification is inappropriate under Rule 23(b)(1).

24

25            **2. Action Based on Grounds Generally Applicable to the Class**
26       Rule 23(b)(2) permits class certification if "the party opposing the class has
27  acted or refused to act on grounds generally applicable to the class, thereby

28

1 making appropriate final injunctive relief or corresponding declaratory relief with

2 respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).

3       "Class certification under Rule 23(b)(2) is appropriate only where the

4 primary relief sought is declaratory or injunctive. A class seeking monetary

5 damages may be certified pursuant to Rule 23(b)(2) where such relief is merely

6 incidental to [the] primary claim for injunctive relief." Zinser v. Accufix Research

7 Inst., Inc., 253 F.3d 1180, 1195 (9th Cir. 2001) (citations and internal quotation

8 marks omitted). There is no bright-line rule for determining what damages are

9 "incidental." Molski v. Gleich, 318 F.3d 937, 940 (9th Cir. 2003). Rather, the

10 Ninth Circuit "examine[s] the specific facts and circumstances of each case . . .

11 focus[ing] on the language of Rule 23(b)(2) and the intent of the plaintiffs in

12 bringing the suit." Id. (citations omitted). The Court may consider "whether a

13 reasonable party would bring the suit to obtain the injunctive relief and whether

14 the injunctive relief sought would be both reasonably necessary and appropriate

15 were the party to succeed on the merits." In re Paxil Litig., 218 F.R.D. 242, 247

16 (C.D. Cal. 2003) (citing Molski, 318 F.3d at 950); Wang, 231 F.R.D. at 611-12.

17       It is undisputed that Defendant classified AMs as exempt based on grounds

18 generally applicable to all AMs. Defendant did not conduct any studies of

19 individual job duties prior to the classification. The remaining question is whether

20 the primary relief sought is injunctive.

21       The money damages sought by Plaintiffs include unpaid overtime wages

22 and wages for missed breaks, as well as penalties for failure to pay overtime,

23 provide breaks, furnish wage and hour statements, pay wages promptly, and

24 maintain payroll records. Plaintiffs' Seventh Cause of Action seeks injunctive

25 relief ordering Defendants to account for and disgorge overtime compensation

26 allegedly wrongfully withheld from AMs. The Eighth Cause of Action seeks an

27 injunction barring Defendant from requiring non-exempt AMs to work overtime

28

without overtime pay, and requiring Defendant to provide meal and rest breaks, provide wage and hour statements, and pay all wages due (including overtime wages) on termination of employment.

Of the roughly 2,750 putative class members, approximately 1,200 are current Wal-Mart employees. (Mot. 20:7.) Thus fewer than half of the putative class members could benefit from the injunctive relief sought. Sepulveda himself is a former Wal-Mart employee and thus would derive no benefit from the injunction, notwithstanding his statement that his "purpose in bringing this lawsuit [is] . . . to change Wal-Mart's policy of not paying California Assistant Managers for overtime." (Sepulveda Decl. ¶ 33.)[12] These factors suggest that the damages sought are not incidental to injunctive relief. See Elkins v. Am. Showa, Inc., 219 F.R.D. 414, 427 (S.D. Ohio 2002); Zapata v. IBP, Inc., 167 F.R.D. 147, 162 (D. Kan. 1996). Furthermore, the damages sought will require highly individualized proof of the duties each AM actually performed, the hours spent on those duties, and the overtime hours actually worked. That "the damages sought are not in the nature of a group remedy but are dependent on individual circumstances" suggests that they are not incidental to the injunctive relief sought. See Elkins, 219 F.R.D. at 427.

The Court finds that class certification is inappropriate under Rule 23(b)(2).


### 3. Predominant Questions of Law or Fact

Finally, Rule 23(b)(3) permits class certification if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to

---

[12] Sepulveda was, however, a Wal-Mart employee at the time the suit was filed. (Gray Decl. Ex. 2 at 44:4-6; Sepulveda Decl. ¶ 2.)

1 | other available methods for the fair and efficient adjudication of the controversy."

2 | Fed. R. Civ. P. 23(b)(3).

3 | ### a. The *Ramirez* Standard for Exempt Status

4 |   The dispute here centers on the need for an individualized inquiry in

5 | determining whether a class member is properly classified as an exempt employee.

6 | IWC Wage Order 7-2001 provides that an employee exempt as an executive must

7 | be "primarily engaged in duties which meet the test of the exemption," Cal. Code

8 | Regs. tit. 8, § 11070, subd. 1.(A)(1)(e), meaning that "more than one-half the

9 | employee's work time" must be spent on exempt duties. Id. subd. 2.(G). In

10 | Ramirez v. Yosemite Water Co., Inc. 20 Cal. 4th 785 (1999), the California

11 | Supreme Court considered a similar exemption provision. Id. at 798 n.4 (noting

12 | the similarity to the Wage Order 7-2001 exemption). The court explained:

> A trial court, in determining whether the employee is [exempt], must
> . . . inquir[e] into the *realistic* requirements of the job. In so doing,
> the court should consider, first and foremost, how the employee
> actually spends his or her time. But the trial court should also
> consider whether the employee's practice diverges from the
> employer's realistic expectations, whether there was any concrete
> expression of employer displeasure over an employee's substandard
> performance, and whether these expressions were themselves realistic
> given the actual overall requirements of the job.

22 | Id. at 802. Thus Ramirez calls for a two-step inquiry. First, the court must

23 | examine, in an individualized fashion, the work actually performed by an

24 | employee to determine how much of that work is exempt.[13] The trial court must

---

[13] Presumably the analysis stops here if the court determines that the employee performs exempt tasks more than 50% of the time.

1   then determine whether the employee's work was consistent with the employer's

2   expectations, and whether those expectations were realistic.

3       In <u>Sav-On Drug Stores, Inc. v. Super. Ct. of Los Angeles County</u>, 34 Cal.

4   4th 319 (2004), the California Supreme Court clarified the application of the

5   principles set forth in <u>Ramirez</u> to class actions under California's class action

6   procedure.  The claims in <u>Sav-On</u> were very similar to those raised here.  The

7   court explained that <u>Ramirez</u> should not be read too broadly in the context of class

8   actions.  "Any dispute over 'how the employee actually spends his or her time,' of

9   course, has the potential to generate individual issues.  But considerations such as

10  'the employer's realistic expectations' and 'the actual overall requirements of the

11  job' are likely to prove susceptible of common proof."  <u>Sav-On</u>, 34 Cal. 4th at

12  336-37 (quoting <u>Ramirez</u>, 20 Cal. 4th at 802).

13      Only two federal courts have considered the impact of <u>Ramirez</u> on class

14  actions for overtime pay.  In <u>Perry</u>, decided before <u>Sav-On</u>, the court denied class

15  certification under Rule 23(b)(3) of a putative class of personal bankers allegedly

16  misclassified as exempt by their employer.  The court noted that numerous

17  common legal questions did exist, including "the question whether the . . . position

18  is exempt or not."  <u>Perry</u>, 2001 U.S. Dist. LEXIS 25050, at *20.  However, the

19  court ultimately found that the common issues of fact did not predominate over

20  individual factual issues, "particularly in light of the differences in individual job

21  duties, as illustrated by the declarations submitted by the [defendant], and the

22  detailed, fact-specific determination required under California law for determining

23  exempt status."  <u>Id.</u>  In <u>Wang</u>, however, the court granted class certification under

24  Rule 23(b)(3) to a class consisting of all current and former non-exempt

25  employees of the defendant.  The court found that despite the need for an

26  individualized inquiry, common questions predominated – including whether the

27  defendant uniformly treated certain classifications of employees as exempt;

28

33

1    conducted an appropriate investigation to support this policy; failed to pay

2    overtime compensation, provide breaks, and provide itemized wage statements to

3    non-exempt employees; and failed to pay all wages due at the end of employment.

4    Wang, 231 F.R.D. at 612-13. The Wang court noted: "because Defendant itself

5    classifies all reporters and account executives as exempt[,] Defendant cannot . . .

6    argue that the Court must inquire into the job duties of each . . . in order to

7    determine whether that individual is 'exempt.'" Id. at 613. The court also noted

8    that broad employer policies can impact many workers at once and thus suggest a

9    need for class treatment. Id. at 614.

10       Wang and Sav-On do not suggest that the Court should ignore the Ramirez

11   standard. They merely state that the Ramirez inquiry is only one of many possible

12   questions in an exemption case. In determining whether an employee should be

13   classified as exempt or non-exempt, an individualized, Ramirez-type inquiry must

14   be conducted. The proper question for the Court at this stage, however, is whether

15   this individualized inquiry is the predominant issue. If common questions

16   pertaining to Defendant's overall policies and practices predominate over the

17   individual question of whether each putative class member was actually non-

18   exempt, then class certification is appropriate.

19                         **b. Factual and Legal Issues**

20       The principal question of law is which AM duties are properly classified as

21   exempt and which are not. This is a common question that most likely can be

22   answered uniformly for all AMs, based on a finite list of tasks that AMs actually

23   did or were expected to perform. A class action is likely the most efficient means

24   of answering this question. The parties agree that AMs have numerous duties and

25   that many of those duties (though not necessarily the amount of time spent on

26   each) are common to nearly all AMs. The question therefore appears both

27

28

34

1   significant and well-suited for class-wide resolution.  There do not appear to be
2   any significant individual questions of law.

3          The questions of fact, in contrast, are both common and individual.
4   Common questions include: whether Defendant has a uniform policy of treating all
5   AMs as exempt; whether Defendant conducted any investigations to determine
6   whether this classification was correct; whether Defendant has uniform policies
7   governing AM duties; whether Defendant has a corporate culture encouraging
8   uniformity in its California stores; whether Defendant had uniform expectations
9   regarding job requirements for its AMs, and whether those expectations were
10  realistic; whether Defendant routinely did not pay overtime to AMs; whether AMs
11  routinely missed meal breaks; and whether Defendant routinely failed to provide
12  accurate itemized wage and hour statements to its AMs.  See Wang, 231 F.R.D. at
13  612-13 (finding that similar questions predominated over individual issues in
14  exempt classification case).

15         Once these common questions have been answered,[14] many highly
16  individualized questions remain.  Most important among these is whether each
17  individual AM actually spent more time working on exempt or non-exempt duties.
18  Ramirez counsels that this must be the first step in the exemption analysis.  Only
19  then should the finder of fact consider any factual issues pertaining to Wal-Mart's
20  expectations or uniform policies concerning AMs.  Ramirez, 20 Cal. 4th at 802.

21         Other individualized questions include (only for those employees who spent
22  more time performing non-exempt tasks) the amount of overtime pay owed, the
23  number of breaks that have been missed, any expressions of dissatisfaction from
24  Wal-Mart with the work the AM was actually performing, and any bias on the part
25  of the AM or reason to believe that the AM was intentionally focusing on exempt

26

27  [14] Many of these issues, however, are undisputed and would not actually need to be
28  litigated.

35

1 duties.  Some of these questions relate to the damages due to each individual AM.

2 Plaintiffs are correct that "'no matter how individualized the issue of damages may

3 be . . . the mere fact that questions peculiar to each member of the class remain

4 after the common questions of the defendant's liability have been resolved does

5 not dictate the conclusion that a class action is impermissible.'"  <u>Haley v.</u>

6 <u>Medtronic, Inc.</u>, 169 F.R.D. 643, 651 (C.D. Cal. 1996) (quoting <u>Sterling v.</u>

7 <u>Velsicol Chem. Corp.</u>, 855 F.2d 1188, 1196-97 (6th Cir. 1988)).  However, this

8 does not mean that the Court must disregard the damages questions altogether in

9 determining whether common issues predominate.

10       **c. <u>AM Duties are not Susceptible to Collective Proof</u>**

11    The Levine Report, along with much of Plaintiffs' evidence, aims to show

12 that the duties of any given individual AM may be determined by examining

13 representative evidence.  (Levine Report 2 ("An evaluation of the allocation of

14 California-based AM hours between distinct duties and activities can be

15 performed by representative sample and does not require AM-specific

16 analyses.").)  In preparing his report, Levine reviewed a large number of

17 documents concerning Wal-Mart, as well as the deposition transcripts of eighteen

18 Wal-Mart managerial employees; he also toured a California Division 1 Wal-Mart

19 store.  (<u>Id.</u>)  However, Defendants have pointed out numerous problems with the

20 Report.  For instance,  Levine examined AM duties over the course of an AM's

21 career; however, California law requires that the Court examine a typical

22 workweek.  Cal. Code Regs. tit. 8, § 11070, subd. 1.(A)(1)(e).  A typical

23 workweek could conceivably vary quite a bit over time.  As an AM becomes more

24 experienced, he or she may take on substantially more managerial responsibility.

25    As Defendant points out, Defendant's official statements of AM duties

26 support Defendant's view that AMs are exempt employees.  (Gray Decl. Exs. 23-

27 32.)  Plaintiffs suggest, however, that these official statements do not reflect the

28

1   realistic requirements of the AM position or what AMs were truly expected to do.

2   The court in <u>Mike v. Safeco Ins. Co.</u>, 223 F.R.D. 50, 53-54 (D. Conn. 2004),

3   rejected a similar argument. The plaintiff argued that the employer "deviated from

4   its job description in a similar manner" with respect to each class member. <u>Id.</u>

5   However, the court denied class certification because the class was not sufficiently

6   well-defined; the court stated that "no benefit is derived from proceeding as a class

7   action because class membership is not founded upon any [employer] policy or

8   other generalized proof, but rather on the fact-specific determination of each

9   individual plaintiff's day-to-day tasks." <u>Id.</u> at 54.

10       Defendant also suggests that AMs may not uniformly comply with standard

11   operating procedures, notwithstanding Wal-Mart's alleged efforts to ensure

12   consistency. Levine's review focused primarily on documents, rather than on

13   interviews with AMs. It did not demonstrate conclusively that Wal-Mart's tactics

14   actually work when applied to individual AMs. Levine discusses the many

15   performance metrics, audits, and reports used by Wal-Mart (<u>see, e.g., id.</u> at 11),

16   but does not provide any data showing that Wal-Mart was obtaining favorable

17   results in the areas relevant to this case. Nor does he specifically discuss any

18   performance metrics, goals, or incentives relating directly to hours spent by AMs

19   on particular duties. Levine attaches a list of the metrics used in the Operational

20   Dashboard; none of these relate to time spent on a particular task. (Levine Report

21   Ex. 1c.) Indeed, Levine admits that none of the standard operating procedures he

22   reviewed dealt directly or even tangentially with the amount of time to be spent on

23   exempt or non-exempt duties, beyond stating that these duties had to be

24   performed. (Gray Decl. Ex. 10 at 164:15-65:23.) For these and other reasons that

25   do not bear mentioning here, the Court attributes little or no weight to Levine's

26   analyses.

27

28

1    In addition to problems with Levine's methodology, Defendant provides

2    voluminous evidence that there actually was a great deal of variance in AM duties.

3    As discussed in the statement of facts above, AM duties varied based on the

4    characteristics of the store, its workforce, and the surrounding community; the

5    AM's experience; the management structure of the store; and the personal

6    preferences of SMs, CoMs, and DMs.  The Saad Declaration reaches the same

7    conclusion.  Based on an observational study and a survey of AMs, Saad

8    concluded that "variety is the rule, rather than the exception."  (Saad Decl. ¶ 23.)

9    As noted, the Court does not rely on Saad's report.  Rather, Plaintiffs' own AM

10    declarations show that there was a wide range of time spent on what Plaintiffs

11    unilaterally deem exempt duties.  Some AMs report spending as little as 10% of

12    their time on exempt duties (see, e.g., Ahmadie AM Decl. ¶ 11, Aldridge AM

13    Decl. ¶ 11) while others spent as much as 45% (see, e.g., D. Anderson AM Decl. ¶

14    11).  Although Plaintiffs have not submitted any declaration stating that the

15    declarant spent more than 50% of his or her time on exempt duties, Defendant has

16    done so.  (See, e.g., Gray Decl. Ex. 48 ¶ 3 (stating that 90-95% of time was spent

17    on exempt work).)  The variance among Plaintiffs' AM declarations alone

18    suggests a strong likelihood that other AMs spent (or were realistically expected

19    to spend) more than 50% of their time on exempt duties.[15]

20    All of these factors cast doubt on Levine's conclusions.  In any case, the

21    Court need not decide that question.  Even if the Court were to accept Levine's

22    conclusion that there is likely to be little variance among AM duties, this does not

23    _____

24    [15] Defendant's position is arguably contradictory.  In classifying all AMs as exempt,
Defendant suggested that it was entitled to treat the AMs as a group.  Defendant now

25    argues that there is considerable variation in AM duties.  Defendant may have
essentially conceded that some of the AMs were likely misclassified.  Alternatively,

26    Defendant may contend some AMs were not meeting Defendant's realistic expectations.

27    Though this may bear on the merits, it does not affect the Court's ruling on class

28    certification.

mean that none of the AMs were properly exempt.  For each AM, Defendant is entitled to raise exempt status as a defense and to present evidence showing that the AM actually did perform primarily exempt tasks.  Based on the evidence submitted thus far, such proof will probably be highly individualized.  Indeed, Defendant has already submitted a number of declarations stating that individual AMs performed primarily exempt work.  If these declarations are correct, then these AMs are indeed exempt employees under California law, regardless of any representational evidence to the contrary that Plaintiffs may provide.  Thus the question of how much time a given AM spent on exempt or non-exempt duties remains an individual one.

The Court finds that the individual questions predominate over common issues.  While common legal and factual questions do exist, there are relatively few that would actually require resolution.  By far the bulk of the evidence would pertain to individualized questions, including the work performed by each individual AM.  Indeed, even Wal-Mart's expectations as to AM duties are likely to require individual proof, since these expectations are affected by so many store-specific factors.  Plaintiffs argue that if the Court accepts Defendant's arguments, no class certification motion could ever be granted in an overtime case.  This argument is without merit.  Other cases may involve far more standardized work policies, more clearly non-exempt duties, and a smaller number of variable factors, rendering them susceptible to the type of collective proof Plaintiffs offer here.

### d. Certification for Limited Purposes Under Rule 23(c)(4)

At oral argument, Plaintiffs conceded that not all questions were suitable for class treatment.  Plaintiffs asked the Court to certify the class for the purpose of answering such questions as what tasks were expected of AMs and whether those tasks were exempt.  Under Rule 23(c)(4), "an action may be brought or maintained as a class action with respect to particular issues" only, if appropriate.  Fed. R.

1    Civ. P. 23(c)(4).   Thus "[e]ven if the common questions do not predominate over

2    the individual questions so that class certification of the entire action is warranted,

3    Rule 23 authorizes the district court in appropriate cases to isolate the common

4    issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular

5    issues." Valentino, 97 F.3d at 1234.

6         However, Rule 23(c)(4)(A) does not permit a court to bypass the

7    requirements of Rule 23(b)(3) entirely simply by defining the issues for

8    certification narrowly enough.  The question of whether partial certification is

9    appropriate under Rule 23(c)(4)(A) is closely linked to the question of whether "a

10   class action is superior to other available methods for the fair and efficient

11   adjudication of the controversy." Fed. R. Civ. P. 23(b)(3); see also In re: N.D.

12   Cal., Dalkon Shield IUD Prods. Liab. Litig., 693 F.2d at 856 (treating Rule

13   23(c)(4)(A) as part of the superiority inquiry).  The focus is on "judicial

14   economy." Valentino, 97 F.3d at 1234.

15        Some courts have focused on whether the individualized issues are confined

16   to damages, or also affect liability.  See In re: N.D. Cal., Dalkon Shield IUD

17   Prods. Liab. Litig., 693 F.2d at 856 (noting that although the class was limited to

18   the issue of liability, the defendant's overall liability could not be proved without

19   individualized proof of proximate cause for each plaintiff); see also Reeb v. Ohio

20   Dep't of Rehab. & Corr., 435 F.3d 639, 658 (6th Cir. 2006) (noting that a court

21   may certify the issue of liability only, leaving the question of damages for

22   individual determination); Rodriguez v. Gates, No. CV 99-13190 GAF (AJWx),

23   2002 U.S. Dist. LEXIS 10654, at *40-41 (C.D. Cal. May 30, 2002)) ("[T]here is

24   no way to adjudicate the class members' claims on a classwide basis – not because

25   damages are individual to each case, but because liability and causation are.").

26   Here, individualized questions are essential to liability because whether the

27

28

1   exempt classification was proper depends in large part on the duties actually

2   performed by each AM.

3        The common disputed issues most susceptible to class treatment in this case

4   are what tasks AMs performed; whether each task was exempt or non-exempt; and

5   whether Defendant has realistic, uniform policies and expectations governing AM

6   duties.  At oral argument, Defendant pointed out problems with even these

7   questions.  For instance, whether a task is exempt or non-exempt may depend on

8   such factors as the experience of the AM, the degree of discretion actually

9   permitted in performing the task, and whether the AM performed the task along

10  with hourly associates for training purposes.

11       The Court finds that "[t]he few issues that might be tried on a class basis in

12  this case, balanced against issues that must be tried individually, indicate that the

13  time saved by a class action may be relatively insignificant."  In re: N.D. Cal.,

14  Dalkon Shield IUD Prods. Liab. Litig., 693 F.2d 847.

15

16  **VI. CONCLUSION**

17       For the reasons discussed above, the Court DENIES Plaintiffs' Motion for

18  Class Certification.

19

20       IT IS SO ORDERED.

21  Dated: *May 5, 2006*

22                                       Dale S. Fischer

23                                United States District Judge

24

25

26

27

28

41